## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARSHA ANN FREDERICK,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ANDREW SAUL, Commissioner of Social<br>Security,<br><br>                    Defendant. | **4:19CV3081**<br><br>**MEMORANDUM AND ORDER** |

Plaintiff, Marsha Ann Frederick, filed this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") that determined Marsha is no longer entitled to disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq., or to supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. due to medical improvement of her condition.  Before the Court are Marsha's Motion for Summary Judgment (Filing No. 16) and the Commissioner's Motion to Affirm Commissioner's Decision (Filing No. 20).  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to Title 28 U.S.C. § 636(c).  (Filing No. 7).  The Court has thoroughly reviewed the parties' filings and the administrative record.  For the following reasons, the Court reverses the Commissioner's decision and remands the case for further proceedings.

## PROCEDURAL BACKGROUND

On November 6, 2008, following a hearing at which Marsha appeared unrepresented by counsel, an Administrative Law Judge ("ALJ") determined Marsha was disabled as of January 23, 2007, due to her heart condition of arrhythmogenic right ventricular cardiomyopathy ("ARVC"). (T.82, 200-201).  On April 22, 2013, the Social Security Administration ("SSA") determined Marsha remained entitled to disability benefits due to her continued disability.  (T.90).  On June 18, 2017, the SSA determined Marsha was no longer disabled as of June 1, 2017, due to medical improvement of her condition, and the last month she would receive benefits would be August 2017.  (T.95).  Marsha requested reconsideration of this determination on June 23, 2017.  (T.99). On July 28, 2017, Disability Determination Services ("DDS") reviewed Marsha's disability status and affirmed the initial determination that Marsha was no longer disabled.  (T.227).  A hearing was

held before a Disability Hearing Officer on November 16, 2017.  (T.104).  The hearing officer's decision dated January 26, 2018, found Marsha's condition medically improved and determined Marsha would be capable of working as an addresser, order caller, or surveillance system monitor. (T.116-126).

On March 16, 2018, Marsha requested a hearing before an ALJ.  (T.127). On April 24, 2018, the SSA provided a letter to Marsha explaining the ALJ hearing process and informed her of her right to representation at the hearing.  (T.131-133).  On May 11, 2018, the SSA sent a Notice of Hearing to Marsha with additional information regarding the ALJ hearing process and her right to representation at the hearing.  (T.144-152).

A hearing before the ALJ was held on August 8, 2018.  At the hearing, the ALJ explained to Marsha that she has a right to a representative and explained the benefits of having a representative.  (T.47).  Marsha stated she tried to find a representative but could not find someone to take her "recertification" case.  Marsha nevertheless signed a "Waiver of Representation," which provided she "fully understood my right to have legal counsel or other representation present and I have decided to proceed with my hearing today without any such representation." (T.48, 159).  The ALJ received testimony from Marsha, Marsha's former husband, and an impartial vocational expert.  Following the hearing, the ALJ issued an unfavorable decision on November 5, 2018. (T.21-37).  Marsha sought an appeal to the Appeals Council and submitted an additional medical provider statement, including a letter from Dr. Erickson dated November 19, 2018.  The Appeals Council denied Marsha's Request for Review of the ALJ's decision on June 19, 2019.  (T.1).  In doing so, the Appeals Council stated Dr. Erickson's statement did not relate to the period at issue because the ALJ decided her case through November 5, 2018.  (T.2).  Marsha timely filed this action to set aside the Commissioner's decision.  (Filing No. 1).

## MEDICAL AND FACTUAL BACKGROUND

Marsha, 35-years old at the time of the ALJ's decision, is a single mother of three children with a high school level education.  Marsha was diagnosed with ARVC in July 2007.  (T.273). ARVC is a progressive, genetic disease, and two of Marsha's three children have the same heart condition.  (T.19, 54-56).  Since her diagnosis, Marsha has had several implantable cardioverter defibrillators ("ICD") placed, which deliver shocks to her heart to regulate arrhythmias.  (T.664). Marsha also takes numerous medications for her condition.

In addition to an ICD and medication, according to her medical records from the arrhythmia clinic at Children's Hospital, Marsha has sought surgical treatment for her condition.  In 2007, Marsha underwent two ventricular tachycardia (VT) ablation attempts at the Creighton University Medical Center.  In November 2011, Marsha underwent another VT ablation at the University of Nebraska Medical Center (UNMC).  On April 2, 2013, "a 5th VT was successfully induced and ablated, no evidence of tachycardias 1, 2, and 4 from the November 2011 procedure was noted, and modification of VT #3 was thought to have been achieved, but was thought to be an epicardial circuit."  On April 2, 2014, Marsha underwent another epicardial VT ablation at Johns Hopkins Medical Center.  This ablation in April 2014 caused "a marked reduction in ventricular ectopy and VT-progressive recurrence of VT including need for antitachycardia pacing since January 2015."  Marsha underwent a repeat VT ablation at Johns Hopkins in April 2015 "with a significant reduction in ventricular ectopy and ventricular tachycardia."  (T.662).  These ablation procedures at Johns Hopkins were cited by the SSA and the ALJ as the cause of Marsha's medical improvement.  (T.27; T.227).

Marsha's heart condition is monitored at the arrhythmia clinic at Children's Hospital in Omaha, Nebraska.  Marsha primarily seeks treatment for other health issues from Sandy Catlin, APRN, at the Community Medical Center in Falls City, Nebraska.  She also has been seeking chiropractic care for migraines from Jacob Bartek, DC.  Marsha's medical records are discussed below.

Marsha sought treatment from APRN Catlin on March 2, 2016, for insomnia, which began immediately after she returned home from her last heart surgery.  Marsha reported sleeping approximately four hours or less per night. (T.554).  APRN Catlin diagnosed Marsha with insomnia due to stress and prescribed restoril.  Marsha was negative for irregular heartbeat or palpitations at that time. (T.557).

On March 14, 2016, Marsha was seen by Dr. Shivani Patel at the arrhythmia clinic.  Marsha's previous follow-up was in July 2015.[1]  Marsha reported she "has been doing quite well from a symptom perspective" and had not "had any palpitations, chest pain, syncopal or pre-syncopal events" after her April 2015 ablation procedure.  Dr. Patel noted Marsha "goes to the gym regularly and usually does weight training, and tolerates that well."  (T.527).  Dr. Patel noted Marsha "has been extremely energetic since her [ablation] procedure and attributes it to the lack of

_____

[1] It does not appear any records from this July 2015 visit are in the administrative record.

the medications that she took prior to the procedure (nadolol, sotalol and mexilitine)," but reported significant sleep disruption. Marsha's cardiovascular exam on this date showed regular rhythm with a normal S1 and S2 with no murmur or gallop. Dr. Patel also reviewed Marsha's Holter monitor data dated February 19, 2016, which showed predominant sinus rhythm with "occasional polymorphic PVCs [premature ventricular contractions] with a single monomorphic ventricular couplet with coupling interval of 520 ms." Marsha's ICD interrogation did show an instance of VT in October 2015. Marsha reported pain around her ICD site and Dr. Patel discussed treatment plans to address her pain. Dr. Patel was "very pleased with how Marsha is doing from an arrhythmia perspective" and was "impressed at the amount of activity [Marsha] is able to do without symptoms or VT." (T.528). Despite the noted improvement, Dr. Patel "discussed activity restrictions and explained the physiology thought to be important in ARVC including avoiding stretch of the RV [right ventricle] via higher cardiac output activities including strenuous exercise to avoid disrupting cell-to-cell desmosomes and creating more scar in the RV." (T.529). It was noted Marsha should follow up at the arrhythmia clinic in six months.

Marsha saw Dr. Erickson at the arrythmia clinic on September 14, 2016, for her follow-up. Marsha continued to have pain around her ICD site and had decided to proceed with a bilateral breast revision and support with implants to address her pain. Marsha reported she was doing well and recently walked in a 5K event with her children. She had a one-month history of dizzy spells occurring approximately two times per week, usually occurring when she has been outside mowing the lawn or gardening. Marsha reported the episodes begin with ringing in her ear and lightheadedness causing her to sit down or kneel. (T.535). Due to her episodes of dizziness Dr. Erickson interrogated her ICD and found no recorded arrythmia events. (T.540). A cardiovascular exam showed regular rhythm with a normal S1 and S2 with no murmur or gallop. Her Holter monitor report from August 24, 2016, "demonstrates occasional polymorphic PVCs including a few monomorphic ventricular couplets with a cycle length of 470 milliseconds and polymorphic couplets with cycle lengths of 470 milliseconds." Dr. Erickson's preliminary review of Marsha's echocardiogram demonstrated normal left ventricle function and adequate, but "subjectively decreased function," of her right ventricle. (T.536). Due to Marsha's improvement, Dr. Erickson extended Marsha's next follow-up visit for one year. (T.537).

Marsha sought treatment from APRN Catlin on November 10, 2016, for upper back and left shoulder pain, and was referred to physical therapy. (T.550-551). Marsha participated in a six-

week physical therapy program at the Community Medical Center in December 2016, for her left shoulder pain and cervicalgia. Her physical therapy records note she has "occasional headaches." (T.677-702).

On February 22, 2017, Marsha was seen for a pre-operative physical prior to her surgery to address her ICD pain as well as an elective abdominoplasty. It was noted her cardiologist was okay with the surgery and she had no significant arrhythmias lately. (T.546). On March 8, 2017, Marsha successfully underwent the breast surgery and abdominoplasty with no complications. (T. 726-727).

On July 20, 2017, Marsha began seeking chiropractic treatment from Jacob Bartek, DC, for neck pain and "throbbing right frontal headaches" that are aggravated by light. A subsequent visit on February 16, 2018, notes that Marsha reported her right frontal headache "has gotten a bit worse since her last visit with us." Marsha was experiencing a migraine-type headache present for the past week. At Marsha's visit on June 14, 2018, Marsha reported her frontal headache and neck pain had slightly worsened. At another visit on June 20, 2018, Marsha reported some slight improvement of pain from an 8 to a 6. She reported feeling this pain between 76% and 100% of the time she is awake and that it was having some effect on her daily activities. Marsha stated she felt the most relief directly following her last appointment but that the pain began to increase again from that point forward. (T.781-788).

Dr. Erickson saw Marsha on September 11, 2017. He noted Marsha "has done reasonably well since her last visit a year ago but states that she has noticed more dizziness when she is up walking around," which is sometimes associated with palpitations, although not each time. Marsha reported walking in a one-mile parade with her daughter but "felt dizzy and on several occasions had to stop periodically and even was pre-syncopal at times," and had palpitations. Marsha reported having dizzy episodes when she is doing activity, that her dizziness is worse when standing, and that she had multiple dizzy episodes per week. (T.661). Dr. Erickson's cardiovascular exam noted "regular rhythm with a normal S1 and S2 with no murmur or gallop." Dr. Erickson reviewed Marsha's ICD and found an event of non-sustained ventricular tachycardia on August 20, 2017, which was not the date of the parade. (T.662). His preliminary review of Marsha's echocardiogram showed excellent left ventricle function but her right ventricle remained dilated with the same degree of mild to moderate tricuspid insufficiency where the ICD lead passes through the tricuspid valve. Under Dr. Erickson's findings, he states, "Neurocardioinhibitory lightheadedness-has

recurrent dizziness" and could not "exclude ventricular bigeminy causing an effective [sic] of halving of her heart rate and would not be detected by her ICD." Dr. Erickson recommended a follow-up to include an event monitor to document Marsha's rhythm at the time of her dizzy episodes. Dr. Erickson concluded "If she is having bigeminal rhythms at the time then treatment for the PVCs would be indicated. On the other hand it could be reassuring that she is not having an arrhythmia at the time of her dizzy episodes but may need other treatment for her neurocardioinhibitory episodes." (T.663).

Aside from her heart and migraine conditions, in October 2017 Marsha began seeking treatment for dysfunctional uterine bleeding, and underwent a hysteroscopy, endometrial ablation, and ultimately a hysterectomy in February 2018. (T.723, 742, 775). On November 15, 2017, at one of her appointments with Dr. Roderick Warren, M.D., Marsha had an abnormal electrocardiogram, with "Inferior T wave abnormality . . . probably due to ventricular hypertrophy" and "low QRS voltages in precordial leads." (T.707). But, prior to her hysterectomy procedure, a pre-operative examination by APRN Catlin on February 23, 2018, noted normal cardiovascular function. (T.765-767).

On March 19, 2018, Marsha saw APRN Catlin for cold symptoms, and on May 3 and May 21, 2018, Marsha saw APRN Catlin for finger numbness. Under "Review of Systems," it was noted Marsha was positive for irregular heartbeats and palpitations, but a physical exams on these dates noted regular rates and rhythms. (T.753-763).

In April 2018, Marsha sought treatment for abdominal pain with nausea and vomiting and reported having headaches at this time. (T.719). On June 22, 2018, Marsha saw APRN Catlin for a two-week long migraine. APRN Catlin noted, "the severity of the problem is severe," "the problem has worsened," and the "symptoms are constant." Marsha's symptoms included blurred vision, nausea, and light sensitivity, and reported the chiropractor did not help. (T.748). Marsha had a normal cardiovascular rate and rhythm on this visit. Marsha was treated with an injection of Demerol and Phenergan and was given a Belsomra sample. (T.751).

## OPINION EVIDENCE

State agency medical consultant, Arthur Weaver, DO, reviewed Marsha's file on June 7, 2017. Based upon Marsha's successful ablation procedures and physical exams noting regular rates and rhythms, together with comments by Marsha's medical providers notes that she had been doing

well with her symptoms, Dr. Weaver concluded there was medical improvement.  Dr. Weaver generally opined Marsha had the physical residual functional capacity ("RFC") to perform a range of light work.  He opined Marsha could occasionally lift no more than 20 pounds and frequently lift no more than 10 pounds. He found Marsha could stand and/or walk with normal breaks for a total of six hours in an 8-hour work-day.  (T.566).  Dr. Weaver found no postural limitations and noted Marsha should avoid concentrated exposure to extreme cold, heat, and fumes/odors/gases, etc.  (T.569).

In a letter dated August 10, 2018, APRN Catlin stated that Marsha's condition causes recurrent unstable ventricular tachycardia and unpredictable ICD shocks. APRN Catlin's letter states that Marsha cannot work in a position that physically stresses her heart, requires aerobic activity, or requires activity putting her in a position to fall due to the risk of her being shocked from her defibrillator.  APRN Catlin states that Marsha's medications for her heart condition cause fatigue and periodic dizziness. Marsha is restricted from driving on the highways.  Nurse Catlin further states that Marsha's migraines and chronic tension headaches interrupt her sleep and last two to three weeks at a time.  Computer and phone light exacerbate these issues.  (T.790).

In a letter dated August 10, 2018, Dr. Erickson stated Marsha's disease of ARVC "presents with life-threatening arrhythmias" and that Marsha has had an implantable cardio-defibrillator [ICD] device for "many years."  Dr. Erickson explained that the device has delivered "appropriate shocks" to Marsha on "multiple occasions," which limits Marsha's ability to work because simple activity often triggers an arrhythmia and a subsequent shock from her device.  Dr. Erickson stated that Marsha received two ablations at John Hopkins University Medical center which "resulted in substantial improvement, but not total resolution of her arrhythmias," although it did allow her more freedom of activity without getting shocked.  Dr. Erickson stated his belief that Marsha is "essentially disabled because of the fear of her condition by potential employers in town."  (T.43).

## THE ALJ HEARING

The ALJ received testimony from Marsha, Marsha's former husband, and an impartial vocational expert.  Marsha testified she has a driver's license but that her doctor advised her not to drive on highways due to episodes of dizziness and palpitations, as well as the potential for her to pass out at the wheel if she has an arrhythmia.  (T.58-60).  In addition to her heart condition, Marsha testified that she was recently diagnosed with Raynaud's disease, which causes her extremities to

lose blood flow and become very cold.  She testified it has become an ongoing problem and although she was taking medication for the condition, it was not helping.  (T.64).  Marsha testified she experiences migraines and headaches almost every day and severe migraines at least twice a week.  She cannot take migraine medication because of her heart condition, so she treats migraine pain with ibuprofen, hydrocodone, or by lying in a quiet dark room with a heating pad, or, if the migraine lasts a week, she will seek chiropractic care.    (T.65-66).

At the time of the hearing, Marsha had been employed for three weeks by a company to set up "planograms" at Dollar Generals, a position she found because her disability benefits had ended. Marsha testified the position requires "a lot of walking" and she has to "sit down a lot" and take several breaks, causing her to take twice as long to complete her work than it should.    Marsha estimated she was working eight to ten hours a week but was only paid for the time it should have taken her to complete her work.  Marsha did not believe she could handle working more hours. Marsha had also worked part-time in a flower shop from April 2018 to July 2018, but had to quit due to her Raynaud's disease, which made her unable to handle the flowers.  Marsha's previous employment included working as a pharmacy technician in 2003, which required her to be on her feet a lot of the time and lift as much as 50 pounds, and working as a casino game dealer in 2005, which also required her to mostly be standing and walking.  (T.60-65).  Marsha did not believe she could work a full-time job that required minimal lifting or minimal walking because all jobs include stress, and stress would further damage her heart.  (T.68-69).  Marsha testified a typical day includes taking care of her children and preparing their meals.  She testified that her son will cook and her daughter will help her when her "heart's been acting up" or when she gets a migraine and needs to lie down.  (T.67-68).

Marsha's former husband, Shawn, testified that they live in a small town of about 4,500 people, and that no one will hire her "because she's a liability."  Shawn testified that Marsha was "very active before" but can no longer exercise because her disease will deteriorate her heart and decrease her lifespan.  (T.54-56).  Shawn testified he lives two hours away from Marsha but tries to help her around the house and with the children a few hours a day.  (T.57).  Shawn testified Marsha used to be active and run several miles a week but her heart disease took that from her. (T.72). Shawn testified that the "weight training" cited by the administration as a sign of Marsha's improvement was just the physical therapy that Marsha engaged in at the Community Medical Center to strengthen her left shoulder that had been weakened from the ICD placement.  (T.73).

A vocational expert, Steven Shult, testified at the hearing.  The vocational expert classified Marsha's past work as a pharmacy technician, which is a light position but described by Marsha at a medium physical demand level, and as a gambling dealer, which is a light position.  The ALJ posed the following hypothetical to the vocational expert:

> [I]f you could assume a hypothetical individual the same age, education, and past work as the claimant with the residual functional compacity to perform work at the light exertional level, except that she must avoid more than occasional exposure to extreme cold, extreme heat; and she must avoid more than occasional exposure to respiratory irritants such as fumes, odors, gases, industrial chemicals, and poorly ventilated areas. She must avoid all exposure to hazards such as unprotected heights and moving mechanical parts; and must never operate a motor vehicle in a work setting. And she cannot climb ladders, ropes or scaffolds. In your opinion, could such an individual perform any of the claimant's past work?

(T.75-76).  The vocational expert testified that hypothetical individual could perform both her past positions as described by the DOT.  If there was an additional mental limitation that the individual would be able to understand, remember, and carry out simple and detailed tasks that could be learned in three months or less, the vocational expert testified the hypothetical individual could not perform any of the past work.  (T.77).  If the hypothetical had the same environmental limitations and the ladders, ropes and scaffolds restriction but at the sedentary level, the vocational expert testified such individual could not perform the past work.  (T.77).  The vocational expert testified the hypothetical individual could obtain other work in the national economy at an unskilled light level as a photocopy machine operator, office helper, or as a sorter.  (T.78).  The vocational expert testified an individual that is off task more than ten percent of the day cannot do competitive employment.  (T.78).

At the hearing, the ALJ inquired from Marsha whether any information was missing from the record for the ALJ's review.  Marsha responded that there were records regarding her heart condition missing because she saw Dr. Erickson in April 2018, but the ALJ only had records through September 2017.  (T.49).  Marsha also responded she had been seeing a chiropractor for her migraines and hip and back pain but the ALJ did not have those records.  At the conclusion of the hearing, the ALJ stated that she would request the most recent records from Dr. Erickson at Children's Hospital and told Marsha it would be helpful for Dr. Erickson to give his medical opinion about Marsha's limitations.  The ALJ stated the record would be kept open for 14-days for Marsha to submit those records and any further medical opinions.  (T.78-80).

As stated above, the ALJ issued an unfavorable opinion on November 5, 2018.  Marsha sought an appeal to the Appeals Council and submitted an additional letter from Dr. Erickson dated November 19, 2018.  In this letter, Dr. Erickson stated that although Marsha appeared "improved" at her last visit, she is still at significant risk for arrhythmias and ICD shocks.  Strenuous exercise worsens the disease process of ARVC and makes her prone to dangerous arrythmias.  He opined that Marsha should avoid lifting much more than 25 pounds on any regular basis.  Dr. Erickson noted that ARVC is a progressive disease, and although intermittent ablations temporarily help her situation, "as indicated by her ICD interrogation today and her symptoms, she is starting to have more palpitations again with limited activity."  Dr. Erickson noted that even after Marsha's improvement after her most recent ablation, she still requires a significant dose of Nadolol to control her ventricular arrhythmias.  (T.19).  In denying Marsha's Request for Review of the ALJ's decision, the Appeals Council stated Dr. Erickson's statement did not relate to the period at issue because the ALJ decided her case through November 5, 2018.  (T.2).

## THE ALJ's DECISION

The ALJ evaluated whether Marsha continued to be disabled using the eight-step sequential process required in medical improvement cases.[2]  The ALJ determined that at the time of the "comparison point decision" ("CPD") of April 13, 2013, Marsha had the medically determinable impairments of arrhythmogenic right ventricular cardiomyopathy and recurrent arrhythmias.  At step one, the ALJ concluded Marsha has not engaged in substantial gainful activity.

---

[2] The eight-steps are:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008)(citing 20 C.F.R. § 404.1594(f)).  This eight-step analysis also includes the five steps followed in an initial disability determination. See *id.* at 946.

At step two, the ALJ found the medical evidence establishes that since June 1, 2017, Marsha has the medically determinable impairments of arrhythmogenic right ventricular cardiomyopathy with arrhythmia and migraines and tension headaches, but that such impairments "have not met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526.)" (T.25). Specifically, the ALJ found that the evidence regarding arrhythmias since June 1, 2017 does not meet the requirements of listing 4.05.[3] As for Marsha's migraines, the ALJ found she had not experienced migraine headaches at the frequency required to meet listing 11.02 and "the record does not contain evidence from a State agency medical or psychological consultant, a medical expert, or a member of the Appeals Council medical support staff that would support a finding of medical equivalence, as required by SSR l7-2p." (T.26).

At step three, the ALJ concluded that medical improvement occurred on June 1, 2017. Specifically, the ALJ cited Marsha's ablation procedures at Johns Hopkins Medical Center in April 2014 and in April 2015, which her treating physician, Dr. Erickson, noted resulted in a "marked" and "significant" reduction in ventricular ectopy and ventricular tachycardia. The ALJ recounted the medical evidence from Marsha's visits to Dr. Erickson at Children's Hospital and to APRN Catlin that documented generally normal cardiovascular findings between her ablation procedures and in 2016, 2017, and 2018. (T.27-28).

The ALJ found that Marsha's impairments of arrhythmogenic right ventricular cardiomyopathy with arrhythmia, migraines, and headaches are severe and cause more than minimal limitation in Marsha's ability to perform basic work activities, and that the medical evidence also indicates Marsha was assessed with Raynaud's disease without gangrene. The ALJ found that the medical evidence did not establish that Raynaud's disease causes more than minimal limitations in Marsha's ability to perform basic work activities and therefore found it to be a non-severe impairment.

Based on the above impairments present since June 1, 2017, the ALJ formulated Marsha's RFC to perform light work with the additional limitations that she must avoid more than occasional exposure to extreme cold, extreme heat, and respiratory irritants, must avoid all exposure to hazards such as moving mechanical parts and unprotected heights, must never operate a motor vehicle in a

---

[3] Listing 4.05 relates to "Recurrent arrhythmias, not related to reversible causes, . . . resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is no prescribed treatment), and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c)." 20 CFR Part 404, Subpart P, Appendix 1.

work setting as part of job duties, and can perform no climbing of ladders, ropes, or scaffolds. (T.29).  The ALJ found Marsha's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the objective medical and other evidence. The ALJ found that the objective medical evidence since the CPD does not support a finding that Marsha has continued to be disabled with respect to her arrhythmogenic right ventricular cardiomyopathy with arrhythmia because Dr. Erickson and APRN Catlin both noted normal cardiovascular findings upon their examinations, including regular heart rate and rhythm with no murmurs, gallops, or rubs.  The ALJ also found the diagnostic studies, including a Holter monitor reading in February 2016, and Dr. Erickson's review of the ICD in September 2016, are not consistent with the severity of symptoms alleged by Marsha. The ALJ also found that the conservative treatment Marsha has received since the CPD tends to suggest her condition is not as limiting as alleged.  (T.30).  The ALJ found that Marsha's treatment providers' comments noting they were "pleased" with Marsha's improvements indicates Marsha's heart condition has improved and "tend[s] to suggest she is not as limited in her functioning as she has alleged."

The ALJ found the evidence did not reflect Marsha reported frequency of headaches or migraines to her medical providers.  For instance, she reported only "occasional" and "intermittent" headaches to her physical therapist in November 2016. She denied headaches at visits with APRN Catlin on March 2, 2016; October 25, 2017; March 3, 2018; and March 19, 2018.  And the ALJ found Marsha generally received conservative treatment for her migraines and headaches during the relevant period.  The ALJ did note that on June 22, 2018, Marsha complained to APRN Catlin of migraine with worsening symptoms, and she was treated with an injection of Demerol and Phenergan, and given Belsomra, but nevertheless discounted the severity of Marsha's complaints because she "has not had to seek emergent medical treatment as a result of her headaches or migraines."

The ALJ gave great weight to the opinion of Arthur Weaver, DO, who reviewed Marsha's file on June 7, 2017.  He generally opined that Marsha was limited to light exertional work with no additional limitations except for avoiding concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation.  (T.32).  The ALJ also gave great weight to the opinion of the Disability Determination Services, which determined that Marsha's disability ceased as of June 2017, largely based upon Dr. Weaver's opinion.  (T.32).  The ALJ also gave great weight to the Hearing Officer's decision. The ALJ gave little weight to the prior ALJ decision because

additional evidence was received after the CPD and after those opinions were provided indicating Marsha had experienced medical improvement.

The ALJ reviewed Dr. Erickson's letter dated August 10, 2018, in which he stated Marsha's heart condition has limited her ability to work since simple activity would often trigger an arrhythmia, causing her to get a shock from her ICD. He also recognized that she has undergone two ablations at Johns Hopkins Medical Center, which resulted in substantial improvement, although not total resolution, of her arrhythmias, which has allowed her more freedom of activity without getting shocked. The ALJ found that this portion of his opinion generally recognizes that Marsha's condition has improved with treatment, but gave no weight to the remainder of his opinion because it regards vocational issues, rather than a medical opinion based upon the objective medical evidence.  (T.33).

The ALJ also reviewed APRN Catlin's August 2018 letter that stated Marsha's employment opportunities are decreased due to not being able to drive on the highway and many employers not hiring her due to the liability of her cardiac condition.  The ALJ gave little weight to that portion of the opinion because it is not an opinion regarding Marsha's functional abilities as a result of her impairments based upon objective medical evidence.  (T.33).

The ALJ also gave little weight to the July 2007 opinion of Dr. Amy Arouni, MD, because it was provided years before the CPD and does not reflect Marsha's current level of functioning.

The ALJ gave some weight to Marsha's ex-spouse's testimony opinion that generally is consistent with a finding that Marsha has some limitation but is also able to perform some activities of daily living, such as preparing meals and doing housework.  The ALJ noted Shawn's testimony where he stated Marsha "has good and bad days, and on bad days, she tries to relax by sitting or lying down." (T.34).

The ALJ found that based upon the testimony by the vocational expert, Marsha is able to perform her past relevant work as a pharmacy technician as generally performed, and as a gambling dealer as actually and generally performed. (T.34).  The ALJ alternatively found there are other jobs existing in significant numbers in the national economy that Marsha is able to perform, specifically, photocopy machine operator, office helper, and sorter.  (T.35).  Therefore, the ALJ found that Marsha's disability ended on June 1, 2017, and had not become disabled again since that date.  (T.36).

In this appeal, Marsha alleges the Appeals Council erred in failing to consider the medical statement from Dr. Erickson dated November 19, 2018, because that evidence relates to the period at issue and there is a reasonable probability that it would change the outcome of the ALJ's decision. Marsha alleges the ALJ erred in determining that there has been medical improvement; alternatively, Marsha alleges the ALJ erred in formulating her RFC because the RFC is not supported by substantial evidence and is contrary to her treating medical provider's statements. Finally, Marsha alleges the ALJ erred in proceeding with the hearing because Marsha did not knowingly and intelligently waive her right to representation and was prejudiced by the lack of representation.

## STANDARD OF REVIEW

Once an individual becomes entitled to disability benefits, her continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f); 20 C.F.R § 404.1594. If there has been a medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate. 20 C.F.R § 404.1594. "The claimant in a disability benefits case has a 'continuing burden' to demonstrate that [she] is disabled, . . . and no inference is to be drawn from the fact that the individual has previously been granted benefits." *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991)(internal citation omitted). If the Commissioner seeks to end disability benefits because of an improvement in the claimant's medical condition, the Commissioner must demonstrate that "the conditions which previously rendered the claimant disabled have ameliorated, and the improvement in the physical condition is related to claimant's ability to work." *Id.* (citing 20 C.F.R. 404.1594(b)(2)-(5)); see *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008)("When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where [s]he is able to perform substantial gainful activity."). "This 'medical improvement' standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits." *Delph*, 538 F.3d at 945.

A reviewing court "will uphold the ALJ's decision to deny benefits if that decision is supported by substantial evidence in the record as a whole." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "Substantial evidence is less than a preponderance, but enough that a reasonable

mind might accept it as adequate to support a decision." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). The reviewing court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). However, the court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008)(internal citations omitted).

## ANALYSIS

### I.     Lack of representation

Marsha argues the ALJ erred in proceeding with the hearing because she did not knowingly and intelligently waive her right to representation. (Filing No. 17 at pp. 22-23). Marsha argues she was prejudiced by the lack of representation because a representative would "likely have further examined the vocational expert and submitted timely medical provider statements, leading to a reasonable probability that the outcome of her case would have been different[.]" (Filing No. 17 at p. 24).

"[T]he administrative hearing is not adversarial in nature, and the ALJ has a duty to develop facts fully and fairly, especially in a case where the claimant is not represented by counsel." *Reeder v. Apfel*, 214 F.3d 984, 987 (8th Cir. 2000). "However, even though the administrative law judge's responsibilities may be enhanced when a claimant is not represented by counsel at the hearing, this lack of counsel would not affect the validity of the hearing unless the claimant demonstrates prejudice or unfairness in the proceeding." *Heisner v. Sec'y of Health, Ed. & Welfare*, 538 F.2d 1329, 1331 (8th Cir. 1976)(citation omitted). The lack of counsel "does not in itself deprive a claimant of a fair hearing." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994)(citing *Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987)).

Marsha argues she did not knowingly and intelligently waive her right to representation because she stated she sought representation but could not find anyone to take her case. However, Marsha acknowledges she received the document that explained the hearing process and informed

her of her right to counsel, including options for representatives when cost is a concern.  The ALJ reiterated Marsha's right to representation at the hearing and Marsha nevertheless signed a waiver of representation.  There is no indication in the record that Marsha lacked the mental capacity to understand her right to representation, which was provided to her both in writing and orally.  Under the circumstances, the Court finds Marsha knowingly waived her right to representation.

## II.      Dr. Erickson's post-ALJ decision letter

Marsha argues the Appeals Council erred in not considering Dr. Erickson's letter dated November 19, 2018.  (Filing No. 17 at p. 16).  "The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision."  *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)(citing 20 C.F.R. § 404.970(b)).  "The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record." *Id.* (citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992).  In circumstances where the Appeals Council denies review after finding the new evidence was either not material or did not detract from the ALJ's conclusion, the reviewing court "do[es] not evaluate the Appeals Council's decision to deny review," but instead, "determine[s] whether the record as a whole, including the new evidence, supports the ALJ's determination."  *Id.*

In this case, the Appeals Council denied Marsha's Request for Review of the ALJ's decision and did not find Dr. Erickson's November 19, 2018, letter material.  Therefore, rather than consider whether the Appeals Council erred in disregarding Dr. Erickson's letter, the Court will instead determine whether the record as a whole, including this letter, supports the ALJ's determination as discussed below.  See *Cunningham*, 222 F.3d at 500.

## III.      Substantial Evidence Supporting ALJ's Determination

Marsha argues that the ALJ's finding of medical improvement is not supported by substantial evidence in the record.  (Filing No. 17 at p. 17).  Alternatively, Marsha argues that if the Court affirms the ALJ's determination that there was medical improvement, the ALJ's subsequent formulation of Marsha's RFC was not supported by substantial evidence in the record.  (Filing No. 17 at p. 21).  The Court agrees that substantial evidence in the record does not support either finding by the ALJ.

*A. Medical Improvement*

The applicable regulations define medical improvement as:

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable decision that you were disabled or continued to be disabled. Although the decrease in severity may be of any quantity or degree, we will disregard minor changes in your signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that your disability has ended. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994a(b)(1)(i). Medical improvement is related to the claimant's ability to work if an impairment improved to the extent that it no longer meets a listing. See 20 C.F.R. § 404.1594(c)(3)(i)("If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work").

The ALJ found that since June 1, 2017, Marsha has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and more specifically, that the evidence does not establish the requirements of listing 4.05 for recurrent arrhythmias unrelated to reversible causes. The ALJ based this determination on the fact that Marsha underwent ablations at Johns Hopkins in 2014 and 2015 that appeared to improve her symptoms.

Marsha's treating physician and medical records are clear that her heart condition is a progressive disease. Marsha's ablations in 2014 and 2015 at Johns Hopkins are cited by the Commissioner as the sole cause of medical improvement. In the letter disregarded by the Appeals Council, Dr. Erickson, Marsha's treating physician, states that while Marsha may have appeared "improved" at her last visit, she is still at "significant risk for arrhythmias and ICD shocks." Dr. Erickson notes that Marsha's ablations "temporarily help her situation." Dr. Erickson notes that Marsha still requires a "significant dose of Nadolol to control her ventricular arrhythmias." APRN Caitlin states that Marsha's medications for her heart condition cause fatigue and periodic dizziness.

The regulations contemplate that:

> In some cases the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, we will be careful to consider the longitudinal history of the impairments, including the occurrence of prior remission, and

> prospects for future worsenings. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.

20 C.F.R. § 404.1594(c)(3)(iv).  Although the parties do not explicitly address this regulation, Marsha stresses that her 2014 and 2015 ablations provided only temporary relief from the frequency of her symptoms from her progressive condition.  According to the SSA Program Operations Manual System (POMS),[4] "Some impairments are subject to temporary remissions, which can give the appearance of medical improvement (MI) when in fact there has been none. These types of impairments can appear to be in remission when, in fact, the impairments are only stabilized." POMS DI 28010.115A. When determining whether temporary remission is an issue, an ALJ should consider "the longitudinal history of the impairment (including the occurrence of prior remissions and prospects for future worsening), all available evidence, including medical source evidence and statements, and medical literature about the disease."  POMS DI 28010.115B1b.  The ALJ did not consider whether the ablations only temporarily improved Marsha's impairments from her progressive condition.

The ALJ cited diagnostic studies and objective evidence where Marsha had normal cardiac exams or regular rhythms as evidence of medical improvement.  For example, the ALJ cited an echocardiogram from August 2017 as objective evidence of improvement because Dr. Erickson stated it showed "excellent left ventricle function;" however, Marsha's left ventricle is not her diseased ventricle, rather, it is her right ventricle.  And on this date Dr. Erickson noted Marsha's "right ventricle remained dilated with the same degree of mild to moderate tricuspid insufficiency where the ICD lead passes through the tricuspid valve."  Dr. Erickson's interrogation of Marsha's ICD at this appointment also found an event of non-sustained ventricular tachycardia on August 20, 2017.  Dr. Erickson then went on to find that Marsha has recurrent dizziness which he could not exclude was caused by ventricular bigeminy that would not be detected by her ICD.  On March 14, 2016, review of Marsha's Holter monitor data from February 19, 2016, showed she had occasional premature ventricular contractions, and an ICD interrogation showed an instance of instance of ventricular tachycardia in October 2015.   It is also significant that the March 2016 arrhythmia clinic records indicate Marsha had been at the clinic for a follow-up in July 2015, but the July 2015 records are not part of the record.  At Marsha's appointment at the arrhythmia clinic

---

[4] "Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003).

in September 2016, her ICD had recorded no arrythmia events, but her Holter monitor report from August 2016, demonstrated occasional premature ventricular contractions, and Dr. Erickson's preliminary review of Marsha' echocardiogram demonstrated adequate, but "subjectively decreased function" of her right ventricle.  The ALJ also did not consider that on November 15, 2017, Marsha had an abnormal electrocardiogram, most likely due to ventricular hypertrophy.

The ALJ also references Dr. Erickson's observations made on September 11, 2017, as evidence of improvement because Marsha no longer experienced daily episodes of dizziness. However, Marsha still reported having "multiple" episodes of dizziness a week rather than daily episodes.  And while medical records indicate Marsha's symptoms had improved, that does not necessarily mean the severity of her impairment no longer meets or equals the requirements of listing 4.05.  See 20 C.F.R. § 404.1594(c)(3)(i).

Additionally, the ALJ's decision is silent on whether any consideration was given to Marsha's psychological distress she experiences from the risk of sudden shock due to her ICD. Listing 4.05 explains that "An arrhythmia is a change in the regular beat of the heart. Your heart may seem to skip a beat or beat irregularly, very quickly (tachycardia), or very slowly (bradycardia)" and that "There are many types of arrhythmias."  This listing provides for further guidance when evaluating "arrhythmias in the presence of an implanted cardiac defibrillator [ICD]," which Marsha has.  According to the listing, ICDs:

> are used to prevent sudden cardiac death in individuals who have had, or are at high risk for, cardiac arrest from life-threatening ventricular arrhythmias. The largest group at risk for sudden cardiac death consists of individuals with cardiomyopathy (ischemic or non-ischemic) and reduced ventricular function. However, life-threatening ventricular arrhythmias can also occur in individuals with little or no ventricular dysfunction. The shock from the implanted cardiac defibrillator is a unique form of treatment; it rescues an individual from what may have been cardiac arrest. However, as a consequence of the shock(s), individuals may experience psychological distress, which we may evaluate under the mental disorders listings in 12.00ff.

The ALJ's decision contains no evaluation or consideration of Marsha's psychological distress resulting from her ICD shocks, which is documented by her testimony and medical records, and whether such distress contributes to the findings that Marsha's condition meets the requirements of listing 4.05.

In sum, the ALJ did not consider all the appropriate criteria when determining if Marsha's impairment or combination of impairments met or medically equaled the severity of impairments

in the requisite listing, substituted its own judgment regarding the significance of medical and diagnostic findings, and failed to consider the nature and extent of Marsha's heart condition and ablation procedures. Because the record regarding Marsha's medical improvement is underdeveloped, the Court will reverse and remand for further proceedings on this issue.

### B. Formulation of RFC

Marsha alternatively argues the ALJ's formulation of her RFC are contrary to the medical records and statements of Marsha's medical treatment providers and are not supported by substantial evidence. The Court will address this assignment of error in the event further development of the record on remand results in a finding of medical improvement.

Once a medical improvement has been established, the Commissioner must determine the claimant's RFC and whether, with this RFC, she can perform her past work. 20 C.F.R. § 416.994(b)(5)(vii). If she can, the Commissioner will find the claimant's disability to have ended. *Id.* If the claimant cannot engage in her past relevant work, the Commissioner must consider whether the claimant can perform other jobs with her current RFC. 20 C.F.R. § 416.994(b)(5)(viii). If she cannot, the Commissioner will find claimant's disability continues. *Id.* Any increase in the claimant's functional capacity must be based on actual changes in the clinical evidence before medical improvement will be considered to be related to a person's ability to work. 20 C.F.R. § 404.1594(b)(3). Disability will continue, even where the medical improvement related to the individual's ability to do work is shown by impairments, when evidence based on all the person's current impairments, shows he or she is not able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(b)(5).

A claimant's RFC is the most she can do, despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. . . The ALJ may not simply draw

his own inferences about plaintiff's functional ability from medical reports." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017)(internal quotation marks and citations omitted).

In this case, the ALJ determined Marsha has the RFC to perform light work with the additional limitations that she must avoid more than occasional exposure to extreme cold, extreme heat, and respiratory irritants, must avoid all exposure to hazards such as moving mechanical parts and unprotected heights, must never operate a motor vehicle in a work setting as part of job duties, and can perform no climbing of ladders, ropes, or scaffolds. The ALJ also found that based upon the testimony by the vocational expert, Marsha is able to perform her past relevant work as a pharmacy technician as generally performed, and as a gambling dealer as actually and generally performed.

The ALJ's finding that Marsha has the ability to perform her past relevant work is not supported by substantial evidence. The ALJ found that Marsha had performed past relevant work as a gambling dealer and pharmacy technician and that she was functionally able to return to such work. However, to constitute past relevant work, a claimant must have performed the work within the last fifteen years as "substantial gainful activity." 20 C.F.R. § 416.965; *Terrell v. Apfel*, 147 F.3d 659, 661 (8th Cir.1998). But the ALJ specifically found that Marsha had not engaged in substantial gainful activity at any time relevant to the ALJ's decision. Moreover, the ALJ's RFC restricts Marsha from working in environments with fumes, odors and gases that may trigger migraines and headaches, but the DOT provides that working in a gambling environment frequently exposes a work to those conditions. Therefore, the ALJ erred in determining Marsha could return to her past work.

The ALJ alternatively found there are other jobs existing in significant numbers in the national economy that Marsha is able to perform, specifically, photocopy machine operator, office helper, and sorter. The ALJ made this finding based upon the following hypothetical to the vocational expert:

> [I]f you could assume a hypothetical individual the same age, education, and past work as the claimant with the residual functional compacity to perform work at the light exertional level, except that she must avoid more than occasional exposure to extreme cold, extreme heat; and she must avoid more than occasional exposure to respiratory irritants such as fumes, odors, gases, industrial chemicals, and poorly ventilated areas. She must avoid all exposure to hazards such as unprotected heights and moving mechanical parts; and must never operate a motor vehicle in a work setting. And she cannot climb ladders, ropes or scaffolds.

(T.75-76).  If the hypothetical had the same environmental limitations but at the sedentary level, the vocational expert testified such individual could not perform her past work.  The vocational expert also testified an individual that is off task more than ten percent of the day cannot do competitive employment.  (T.78).

The ALJ determined Marsha was capable of performing light work.  Pursuant to 20 C.F.R. § 404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

"'Light work'" requires that a claimant be capable of standing or walking for a total of six hours out of an eight-hour work day." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995)(citing See Social Security Ruling 83-10).  As recounted above, Marsha experiences frequent bouts of dizziness, cannot walk a mile without needing to stop, and must often sit or lie down to deal with palpitations or migraines.  Marsha's ARVC condition requires activity restrictions because exercise and stress will further damage her heart.   A disability inquiry must focus on the claimant's ability "to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000).  "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).  The ALJ's hypothetical did not account for the disruption that Marsha's impairments requiring her to sit or lay down for extended periods of time multiple times a week would cause in a competitive work setting. And, the vocational expert testified that individual who is off task more than ten percent of the day cannot do competitive employment.  In this case, the record does not contain substantial evidence that Marsha's impairments make it possible for her to stand or walk for a total of six hours out of an eight-hour work day, or that she can remain on task for more than ten percent

of the day.[5]  Because substantial evidence does not support the ALJ's formulation of Marsha's RFC, the Court will remand this determination for further proceedings.

"In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings."  *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).  "Sentence four remands are proper when a district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case accordingly."  *Id.* The Court will reverse and remand this case for further proceedings on the issues of medical improvement and, alternatively, Marsha's RFC, consistent with this opinion.  Upon consideration,

**IT IS ORDERED:**

1.   Plaintiff's Motion for Summary Judgment (Filing No. 16) is granted to the extent that it requests remand;

2.   The Commissioner's Motion to Affirm Commissioner's Decision (Filing No. 20) is denied;

3.   This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order; and

4.   A separate judgment will be entered.

Dated this 30th day of November, 2020.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

---

[5] The ALJ gave great weight to the opinion of Dr. Weaver, DO, a nonexamining medical source.  "Opinions of nonexamining medical sources are generally given less weight than those of examining sources," *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (ellipsis omitted), particularly "when the nonexamining experts opinion is given in checklist format" *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011).  Additionally, "the opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation." *Id.* at 616.  Dr. Weaver did not examine Marsha and reviewed Marsha's file on June 7, 2017, and did not have access to over a year of additional records.  On remand, the opinion of Dr. Weaver should be re-weighed in light of any additional evidence or opinion evidence developed for the record.